[Cite as *State v. Meese*, 2014-Ohio-1045.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. Patricia A. Delaney, J.<br>Hon. Craig R. Baldwin, J. |
| -vs- | |
| MICHAEL R. MEESE | Case No. 2013AP0090038 |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Tuscarawas County Court
of Common Pleas, Case No.
2011CR120304

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      March 17, 2014

APPEARANCES:

For Plaintiff-Appellee          For Defendant-Appellant

RYAN STYER          GERALD A. LATANICH
Tuscarawas County Prosecutor          153 N. Broadway
R. SCOTT DEEDRICK          New Philadelphia, Ohio 44663
Assistant County Prosecutor
for Tuscarawas County
125 East High Avenue
New Philadelphia, Ohio 44663

*Hoffman, P.J.*

{¶1} Defendant-appellant Michael Meese appeals the September 18, 2013 Judgment Entry entered by the Tuscarawas County Court of Common Pleas revoking his community control sanctions. Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE CASE AND FACTS

{¶2} On June 20, 2012, Appellant entered a plea of guilty to one count of robbery, a violation of R.C. 2911.02, a second degree felony. On August 17, 2012, the trial court sentenced Appellant to three years in the Ohio Department of Corrections, with two days credit.

{¶3} On February 20, 2013, Appellant filed a motion for judicial release. The trial court scheduled a hearing on the motion for April 15, 2013. Via Judgment Entry of April 17, 2013, the trial court released Appellant to the custody of Stark County Regional Community Correction Center (SRCCC), granting the motion for judicial release, imposing four years of community control with initial placement in an intensive supervision program. The trial court ordered Appellant must abide by all specific conditions of community control. Appellant was admitted to SRCCC on April 18, 2013.

{¶4} On August 19, 2013, the State filed a motion to revoke or modify Appellant's community control sanctions, specifically asserting Appellant failed to fully participate in and successfully complete the SRCCC program. More specifically, Appellant had been terminated unsuccessfully from SRCCC on or around August 13, 2013.

{¶5} The SRCCC discharge summary of August 14, 2013, indicates Appellant's discharge status as termination, and a termination reason as "physical altercation with another client."

{¶6} On September 16 and 17, 2013, the trial court held a merits/evidentiary hearing on the motion to revoke/modify community control. At the hearing, Appellant's probation officer, Mike Davies, testified as to the August 12, 2013 incident report of SRCCC indicating Appellant was involved in a physical altercation while on community control. Davies also testified he received notice Appellant was terminated from SRCCC due to the physical altercation.

{¶7} The Resident Supervisor of SRCCC, Dennis Evans, testified at the hearing, as follows:

{¶8} "Q. Okay. Now, were you aware of Mr. Meese being a resident at S-R triple C?

{¶9} "A. Yes.

{¶10} "Q. And had you had some involvement with him at the facility, in terms of your job duties and responsibilities?

{¶11} "A. Yes.

{¶12} "Q. Okay. Were you aware of an alleged physical altercation that occurred on August twelve, two thousand thirteen?

{¶13} "A. Yes I was.

{¶14} "Q. And would the nature of the allegation itself constitute the conduct was an alleged minor or major violation?

{¶15} "A. It would be major.

**{¶16}** "Q. Okay. And as such, were you then charged with conducting an investigation into the matter?

**{¶17}** "A. Yes.

**{¶18}** "Q. Okay. And did you do that investigation?

**{¶19}** "A. Yes.

**{¶20}** "Q. And did you submit your report to the, up the chain of command as you indicated?

**{¶21}** "A. I did.

**{¶22}** "Q. And was your, what was your conclusion based on your investigation?

**{¶23}** "A. My conclusion was that there was some form of physical altercation that took place - -

**{¶24}** "Q. Okay.

**{¶25}** "A. - - in that, in the room.

**{¶26}** "Q. Alright. And you passed that up the chain of command?

**{¶27}** "A. Yes.

**{¶28}** "Q. And you were aware than that Mr. Meese was terminated unsuccessfully from the program?

**{¶29}** "A. Yes.

**{¶30}** "Q. Alright. Now, what was the initial report that you received that started this process?

**{¶31}** "A. The initial report was that that morning, one of our transport officers, Annette Williamson, was monitoring our monitoring center on the male wing. During that time, she noticed in, I believe it was room one-fifteen, at the time it appeared that

Mr. Meese was involved in a physical fight with another resident. She had someone else in the, the monitoring center with her, so she was able to go outside of that, that center to instruct them verbally to stop and then to come out of the room. And she also radioed for another resident supervisor to, to come over to the day room to investigate. And then at that point the, the clients exited the room and, according to the resident supervisor that reported to the day room to intervene, according to him it was kind of dismissed as being horse play. None of the residents were really saying much about it at that the time. But again, by the time he got there, they were out of their room and it wasn't witnessed by anybody else. It was at that, from that report I initiated a more thorough investigation into it.

{¶32} "Q. Okay. And obviously you spoke to transport officer Williamson?

{¶33} "A. Yes.

{¶34} "Q. Alright. And what else did you do generally in terms of your investigation?

{¶35} "A. I speak to everyone that was involved. The person that witnessed the, the staff person that witnessed the incident, any clients that were either involved directly or indirectly with the incident.

{¶36} "Q. Okay. It was, now I understand that, from what you explained, transport officer Williamson was in the monitoring room?

{¶37} "A. Yes.

{¶38} "Q. But she observed it personally and not on a monitor. Is that correct?

{¶39} "A. Correct.

**{¶40}** "Q. The, were you able to look at the monitors in terms of any video footage that would have occurred during the incident?

**{¶41}** "A. I, I did.

**{¶42}** "Q. Okay. Was it, was there anything on that that you were able to see?

**{¶43}** "A. I could not see if there was an actual physical altercation based on the angle of our cameras. The cameras aren't set up to, to view inside the client's rooms, only on the outside. Ms. Williamson would have had a much better view because she could see directly into that room from the monitoring center. All I could see was, was an angle of the partial, part of the doorway to the room.

**{¶44}** "Q. Okay. Now who were the residents that were in the room when the physical altercation is alleged to have occurred?

**{¶45}** "A. Mr. Meese was present in the room. Mr. Roger Shortridge was present. Mr. Nagel, who was the victim of this incident. And I believe there was a Mr. Taylor that was in the room as well, but he's no longer in the program.

**{¶46}** "Q. Okay. Did you speak to all four of those individuals?

**{¶47}** "A. Yes.

**{¶48}** "Q. Okay. Now, the transfer, take us through what the transfer officer, Williamson, said that she observed.

**{¶49}** "A. While she was monitoring the, the day room at that time, the room in question is just to the left if you're standing facing the day room outside the, the monitoring center windows, the room in question is directly to the left. When she looked over that direction, she, she saw what appeared to be Mr. Meese and Mr. Nagel exchanging punches.

**{¶50}** "Q. Okay.

**{¶51}** "A. And it was at that time that she instructed them to stop over the p-a system. Then she exited the, the monitoring center and verbally instructed them again and radioed for assistance to come over.

**{¶52}** "Q. Alright. Now, initially all of the persons in the room downplayed the, the altercation you indicated?

**{¶53}** "A. Correct.

**{¶54}** "Q. Did you have the opportunity to speak to Mr. Nagel regarding what occurred in the incident?

**{¶55}** "A. Yes.

**{¶56}** "Q. What did he initially tell you?

**{¶57}** "A. Initially he told the staff that intervened that, well actually he didn't tell them much of anything other than, you know, he just kind of laughed it off and, and walked away from it. So initially he didn't really report anything. It wasn't until that, late that afternoon is when he reported to staff that it was a physical altercation, that he was quote jumped by Mr. Meese in the room and then it was the next morning that I initiated the more thorough investigation.

**{¶58}** "Q. So initially downplayed it, then admitted that he was jumped?

**{¶59}** "A. Yes.

**{¶60}** "Q. And then you spoke to him the next day?

**{¶61}** "A. Correct.

**{¶62}** "Q. What did he tell you when you talked to him directly?

**{¶63}** "A. He told me that he believed it was over money. He stated that, something about he owed Mr. Meese fifteen dollars or something - -

**{¶64}** "Mr. Latanich: For the record Judge, we would renew our objection on that point and move to strike.

**{¶65}** "The Court: Okay. Overruled, go ahead.

**{¶66}** "A. He said that he was inside the doorway of the room talking to one of the other clients and it was at that time that he claims that Mr. Shortridge entered the room, passed him, and then that Mr. Meese had shoved him in the room from behind and then that's when the, the physical altercation ensued.

**{¶67}** "Q. Okay. So Mr. Nagel indicated that the physical, the physical altercation began with him being shoved in the room by Mr. Meese and then assaulted by Mr. Meese?

**{¶68}** "A. Correct.

**{¶69}** "Q. Alright. And he indicated at, at that time that he believed the motivation was, was that he owed money to Mr. Meese?

**{¶70}** "A. Yes.

**{¶71}** "Q. Okay. Did he then provide additional details at any other time to you?

**{¶72}** "A. In regards to this incident?

**{¶73}** "Q. Yes.

**{¶74}** "A. Nothing other than he was fearful of retaliation. You know, he was in fear that maybe, that something may, they may attempt to assault him again if he remained in the day room, you know, or in the general population with Mr. Meese or Shortridge."

**{¶75}** Tr. at 14-20.

**{¶76}** Nicholas Nagel, the alleged victim of the physical altercation, then testified at the hearing as to the incident:

**{¶77}** "Q. Now were you in Mr. Meese's room on August twelfth of two thousand and twelve?

**{¶78}** "A. Yes I was.

**{¶79}** "Q. Describe to the Court what happened.

**{¶80}** "A. I mean Meese put his hand on my back and then next thing I know the R-S's were coming in, acting like some big ordeal happened or something like that.  And we explained to the one R-S that nothing happened.

**{¶81}** "Q. Who was the first, who, was there more then [sic] one R-S that showed up?

**{¶82}** "A. Yeah, there was a R-S named Walt.  Well, when it first happened there was one R-S that, through the glass, through the C-M-C window, started pounding on the glass and then Walt had come over.  And we were talking to him and everything was fine it's why I don't understand what happened.  And then the other R-S came over and started flipping out, saying that we were in there and we were fighting, we had an altercation or something like that.  We didn't understand, even the other R-S didn't understand why she was flipping out.

**{¶83}** "Q. Was there, was there a fight?

**{¶84}** "A. No there was definitely no fight whatsoever.

**{¶85}** "Q. Was, how would you relate the tension level in the room before the R-S's showed up?

**{¶86}** "A. There wasn't really any tension level, I mean.

**{¶87}** "Q. What, so, did you ever have any conversations with any of the other staff where you stated that you were assaulted?

**{¶88}** "A. No I definitely didn't, never said I was assaulted.

**{¶89}** "Q. And, as of today, explain once again to the Court what happened, what, what actually happened in the room on that day.

**{¶90}** "A. I mean, the only thing that happened as far as anybody even touching each other was he put his hand on my back.  I mean, he didn't do it in a violent manner or anything like that.  I mean, it's, you know, I don't know how else to explain it."

**{¶91}** Tr. at 50-51.

**{¶92}** On cross-examination, Nagel testified:

**{¶93}** "Q. So Mr. Shortridge, that wouldn't be accurate that there was horse play and that you guys were shoving each other?

**{¶94}** "A. No, I mean we were joking around and whatnot, but I mean there wasn't no like shoving or anything like that.

**{¶95}** "Q. Okay.  Could you explain why you were jumping around?

**{¶96}** "A. I don't know, just acting foolish I guess.  I mean, I was really the one jumping around, I mean, they weren't, I mean.

**{¶97}** "Q. Why were you jumping around?

**{¶98}** "A. In all honesty, to be stupid.

**{¶99}** "Q. Okay.

**{¶100}** "A. To just try to, I don't know, be comical I suppose would be the word for it.

{¶101}  "Q. But there wasn't any kind of horse play?

{¶102}  "A. Not really, I mean.

{¶103}  "Q. And was, did you see any kind of horse play around S-R triple C?

{¶104}  "A. Yeah, I mean it's always going on around there, I mean there's always people shoving each other.

{¶105}  "Q. Even though that's against the rules?

{¶106}  "A. Yeah.

{¶107}  "* * *

{¶108}  "Q. Now I'm a little confused why you told the R-S two Graham that you had been jumped in the room and beaten.

{¶109}  "A. I don't understand where that came from, I mean, if you can show me where - -

{¶110}  "Q. Did you say that?

{¶111}  "A. No I definitely didn't.

{¶112}  "Q. So that, that's a lie?

{¶113}  "A. Yeah.

{¶114}  "Q. Okay.   That you told that person that you were standing in the doorway to room one-eleven, talking to client Taylor, and then Mr. Meese pushed you from behind into the room, is that truthful or a lie?

{¶115}  "A. It ain't truthful, I mean.

{¶116}  "Q. That once you were in the room, Meese and Shortridge both physically assaulted you. Truthful or not?

{¶117}  "A. Not truthful.

{¶118}  "Q. Okay.  And that you punched back to try to get out of the room.

{¶119}  "A. No, it definitely didn't happen.

{¶120}  "Q. Okay.  And now you spoke to Mr. Evans, who testified that you stated to him that you believed the motivation for the jumping was that you had borrowed a few dollars from Mr. Meese.

{¶121}  "A. I never borrowed any money off Meese.

{¶122}  "Q. So that's a lie also?

{¶123}  "A. Yeah.

{¶124}  "Q. Okay.  And that Mr. Meese was actually trying to get fifteen dollars from you that this was the motive from the attack.

{¶125}  "A. Never happened.

{¶126}  "Q. Okay. That's a lie?

{¶127}  "A. Yeah.

{¶128}  "Q. Okay.  Do you have any idea why the, Mr. Evans would say that you told him yourself that you were afraid of Mr. Meese and Mr. Shortridge?

{¶129}  "A. I have no idea.  I think things are way blown out of proportion.

{¶130}  "Q. But you would agree, these are pretty specific things for them to invent.

{¶131}  "A. Sounds pretty specific, but if you want to make somebody believe something you got to make it specific don't you?

{¶132}  "Q. Could you understand what their motivation would be for putting all these words in your mouth?

{¶133}  "A. Sounds like a witch hunt to me if you ask me.

**{¶134}** "Q. Oh, so they're out to get Mr. Meese?

**{¶135}** "A. I don't know, I don't know. I mean, this is what is [sic] seems like to me. I'm not a professional, I don't know, I mean."

**{¶136}** Tr. at 53-56.

**{¶137}** Via Judgment Entry of September 19, 2013, the trial court resentenced Appellant thereby revoking his community control sanctions. The trial court found the State had proven by a preponderance of the evidence on or about August 13, 2013, Appellant was unsuccessfully terminated from the SRCCC program. The trial court reimposed the three year term of imprisonment for the one count of robbery. The trial court granted 399 days of credit.

**{¶138}** Appellant now appeals, assigning as error:

**{¶139}** "I. DUE PROCESS UNDER THE 14TH AMENDMENT IS VIOLATED DURING A REVOCATION HEARING WHEN ALLEGATIONS ARE ALLEGED WITHOUT PROPER NOTICE BEING GIVEN TO THE ACCUSED.

**{¶140}** "II. DUE PROCESS UNDER THE 14TH AMENDMENT IS VIOLATED WHEN A REVOCATION IS BASED TOTALLY ON HEARSAY.

**{¶141}** "III. THE TRIAL COURT ABUSED ITS DISCRETION IN REVOKING THE COMMUNITY CONTROL SANCTION STATUS OF MR. MEESE WHEN THE COURT CONSIDERED NO OTHER OPTIONS OTHER THAN PRISON AND THE JUDGE'S STATEMENTS IN OPEN COURT SHOWED THAT NO OTHER OPTIONS WERE EVEN CONSIDERED."

**{¶142}** Appellant's assigned errors raise common and interrelated issues; therefore, we will address the arguments together.

**{¶143}** Appellant argues the trial court erred in revoking his community control based upon hearsay allegations without proper notice of the accusations and without considering other options other than imprisonment.

**{¶144}** Ohio Criminal Rule 32.3 reads,

**{¶145}** "(A) Hearing

**{¶146}** "The court shall not impose a prison term for violation of the conditions of a community control sanction or revoke probation except after a hearing at which the defendant shall be present and apprised of the grounds on which action is proposed. The defendant may be admitted to bail pending hearing."

**{¶147}** The State's motion to revoke lists the reason for termination as "physical altercation with another client." In *Morrissey v. Brewer* (1972), 408 U.S. 471, 92 S.Ct. 2593, the United States Supreme Court stated the minimum due process standards applicable to a revocation proceeding, holding:

**{¶148}** "With respect to the preliminary hearing before this officer, the parolee should be given notice that the hearing will take place and that its purpose is to determine whether there is probable cause to believe he has committed a parole violation. The notice should state what parole violations have been alleged. At the hearing the parolee may appear and speak in his own behalf; he may bring letters, documents, or individuals who can give relevant information to the hearing officer. On request of the parolee, person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence. However, if the hearing officer determines that an informant would be subjected to risk

of harm if his identity were disclosed, he need not be subjected to confrontation and cross-examination.

{¶149}   "The hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parole revocation and of the parolee's position. Based on the information before him, the officer should determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation. Such a determination would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision. As in Goldberg, 'the decision maker should state the reasons for his determination and indicate the evidence he relied on . . .' but it should be remembered that this is not a final determination calling for 'formal findings of fact and conclusions of law.' 397 U.S., at 271, 90 S.Ct., at 1022. No interest would be served by formalism in this process; informality will not lessen the utility of this inquiry in reducing the risk of error.

{¶150}   "(b) The Revocation Hearing. There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority. This hearing must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation."

**{¶151}** Here, Appellant waived the preliminary hearing. Appellant maintains the State orally alleged extortion charges involving Appellant while at SRCCC as grounds for his termination from the program. Appellant moved to exclude any testimony regarding said allegation, as it was not included in the previously provided grounds for termination. The trial court overruled the motion.

**{¶152}** Upon review of the record, the only written allegation by SRCCC for termination of Appellant involved Appellant's physical altercation with another client. Mike Davies, Appellant's probation officer, testified he initiated the revocation of Appellant's community control based upon Appellant's termination at SRCCC for the physical assault, not extortion. We find the testimony concerning Appellant's attempt to collect money from the victim was part of the *res gestae* of the altercation and was not used as an independent ground in the trial court's decision to revoke community control.

**{¶153}** Dennis Evans, the Resident Supervisor, testified at the hearing as to the incident report he prepared following the physical altercation involving Appellant and Mr. Nagel on August 12, 2013. He testified as to his conversations with Nagel following the incident. Mr. Nagel then testified at the hearing, calling his credibility into question. He denied the incident as anything but horseplay and denied making any statements to Evans.

**{¶154}** The weighing of the evidence and the credibility of the witnesses are issues within the sound discretion of the trial court. *State v. Jamison* (1990), 49 Ohio St.3d 182. We find the trial court's decision to revoke was not merely based upon the hearsay testimony of Ms. Williamson.

**{¶155}** Based upon the testimony presented at trial, we find the trial court did not abuse its discretion in finding the State demonstrated by a preponderance of the evidence Appellant was unsuccessfully terminated from SRCCC. Accordingly, we find the trial court did not err in granting the motion to revoke Appellant's community control sanction.

**{¶156}** Appellant's three assigned errors are overruled, and the September 18, 2013 Judgment Entry of the Tuscarawas County Court of Common Pleas is affirmed.

By: Hoffman, P.J.

Delaney, J. and

Baldwin, J. concur